**YATES v. JONES et al.**
No. 838.

United States District Court
E. D. Virginia, Norfolk Division.
Dec. 17, 1948.

---

John S. Rixey (Rixey & Rixey), Norfolk, Va., A. Yates Dowell, Washington, D. C., J. Melville Broughton and Douglass & McMillan, Raleigh, N. C., for plaintiff.

Jo Baily Brown, Pittsburgh, Pa., W. R. Ashburn, Norfolk, Va., James B. McDonough, Jr., Norfolk, Va., and W. R. C. Cocke, Norfolk, Va., for defendants.

BRYAN, District Judge.

A railroad locomotive coalstoker distributor plate, for which the plaintiff Yates holds letters patent No. 2,408,358, is said to have been imitated by the defendants, in their manufacture and use of the Berkley plate, and this action seeks injunctive and indemnitory relief against the infringement charged.

A distributor plate is fitted into the door of the firebox of a locomotive, and is the last conduit through which the coal passes, impelled by the stoker screw, from the locomotive tender into the firebox. The conventional firebox is rectangular in shape, some 5 or 6 feet in width and from 8 to 9 feet long. Efficient operation of a locomotive requires the maintenance of a constant head of steam, and this can be accomplished economically only by an even firebed.

Normally the coal leaves the worm and enters the firebox by crossing the firedoor threshhold or step, which is the initially involved part of the distributor. It falls by gravity off the step into the box, and would accumulate just below the firedoor, were it not, while falling, blown and spread by steam from numerous jets, arranged horizontally immediately beneath the step and in what might be termed the riser of the step. The jets expel the steam with such force as to protect and scatter the coal forward into the firebox. Steam is forced into these jets from separate compartments. The fireman may adjust the steam pressure in each jet and thus control the spread of coal.

Difficulty was experienced, however, in directing the coal into the rear corners of the firebox, that is, to the immediate right and left of the firedoor. This difficulty is readily understood when it is remembered that the door is in the center of the rear wall of the firebox, and that the jets are aimed straight ahead. Manual shifting of the coal was therefore frequently necessary, to overcome the failure of the automatic spreading process uniformly to cover the floor of the firebox; otherwise there resulted an irregularity of draft and consequent reduction in the head of steam. The correction of this mechanical deficiency was the object of both the Yates patent and the new Berkley distributor.

Prior to the summer of 1945 the Berkley distributor plate was manufactured by the defendant Berkley Machine Works & Foundry Co., Inc., herein designated Berkley, and used by the Seaboard Air Line Railway Company on its locomotives, in the design and having the operation just outlined. That summer the Berkley plate, as it appeared on the Seaboard engines, adopted a new design to solve the previous inefficiency in the automatic feed. In substance, it was this:

The jets were relocated and placed nearer the middle of the riser, thus leaving space (on each side) between the outermost jets and the ends of the first step, so that the coal in the outer edges of the stream would not fall over and into the line of discharge of the forwardly directed jets. There was added a tray or table, some 5 or 6 inches wide, extending into the firebox, and running horizontally for almost the width of the first step, but below it and below the line of jets. Actually it was a second step with the trajectory of the forwardly directed jets above and

across it. Protruding straight ahead into the firebox at each end of the second step, but beneath it, was a steam jet-chamber or nozzle, which was farther advanced into the firebox than were the first-mentioned or forwardly directed jets. The second step is actually an iron plate bridging the space between the two jet-chambers or nozzles. On the outer side, and near the end, of each of such projecting members were jets facing to the side walls and rear corners of the firebox. These were known as advanced, lower, lateral jets, because they were situated further into the firebox than the other jets, on each end of the second step (and thus below the other jets) and were aimed at right angles to the course of the other jets. All of this comprised the upper or back member of the distributor plate.

Into the upper member and close under the second step was fitted a firing plate, in such manner that the projections or nozzles containing the lateral jets fitted into recesses in the firing plate. The firing plate was wider than the second step and allowed the lateral jets to discharge over its end surfaces. This firing plate is variously designated as the depending member, lower member or the front piece.

The operation of the new plate was such that as the coal dropped by gravity from the first step onto the second step, the coal in the center of the stream was sprayed forward, by the upper jets, into the fore parts of the firebox; while the coal in the outer edges of the coal stream fell to the side, and out of the reach, of the upper and forwardly aimed jets, onto the surface of the firing plate, in the course of which it was blown to the sides and rear corners of the firebox by the lower, lateral, advanced jets.

The new Berkley plate in a large measure accomplished the desideratum—it threw the coal into the rear corners of the box by means of the advanced lateral jets, and into the front part of the firebox by the common or forward jets. In this operation and in the design therefor, Yates says, the Berkley plate, which has been extensively made and sold by the defendant, Berkley,

and used equally extensively by the defendant Seaboard, infringes his patent. Undoubtedly the operation of the Berkley and the Yates plates is generally similar. The Yates plate has the two nozzles, with the lateral jets; these jets are lower than the forwardly directed jets; and they are advanced jets. It also has the firing plate situated below the upper jets. There are, however, important differences in their construction, and these are discussed later.

The claims of invention in the Yates patent are twofold: (1) the already mentioned lower, lateral, advanced jets and (2) the firing plate also already described. The plaintiff says, too, that it was not a coincidence that in the early summer of 1945 the Berkley plate for the first time appeared with the advanced, lower, lateral jets and with the firing plate, because on May 7, 1945 he had applied for his patent (issued September 24, 1946), and that in May his conception, he says, was revealed to Berkley and its president, the defendant Samuel G. Jones. He charges a deliberate appropriation of his ideas.

But the Court thinks the plaintiff's case must fail because (1) his patent is invalid as lacking in invention and novelty, (2) the Berkley plate does not infringe the patent, and (3) no theft of the plaintiff's idea has been proved, but rather the prior ownership of the idea by Berkley.

I. While the addition of the lateral jets, as well as the firing plate, was important in distributing the coal, the Court does not consider they constitute invention. The idea behind them was nothing more than the carrying forward of an old and well known process of spreading coal about the firebox by use of steam jets. The basic idea of this process is simply that the coal could be directed as desired by turning the steam in that direction, which obviously includes the idea that to get the coal into the rear corners and to rear sides of the box, the steam must be directed to those parts. Adoption of lateral jets to that end, appears to the Court as a solution which would have occurred to almost anyone observing the spraying of the coal. To send the coal to the side or to the rear corners clearly re-

quired steam jets facing in those directions. Equally evident was the inability to use the upper, or forwardly directed, jets for the purpose, because the angle of their aim was not sharp enough to reach the corners. The plain means of removing this flaw was to have jets placed at appropriate angles, and so to place them meant locating them in advance of the upper jets; otherwise the angle could not be obtained. Again, it would seem equally apparent that to throw the coal into the corners or sides, the coal so to be thrown, must be taken out of the range of the forwardly directed jets.

In sum, what was accomplished by the Yates patent as well as in the new Berkley plate, was no more than that to be expected from anyone skilled in the use or construction of locomotive distributor plates—simply the turning in another direction, or the further bending of the angle of application, of the means of coal distribution already in use. This was not invention, but merely the attainment of a better result through the extension of old methods.

The concept of scattering coal to the rear corners and sides of the firebox by jets aimed in that direction, and indeed by lower and advanced jets, is not new. Aside from its previous realization by Berkley, as we shall later discuss, it is found in other and older distributor plates and patents. For instance, it appears in the plate exhibited in this case as the B. & O. plate, which is the Capps Patent. No. 2,213,334, issued September 3, 1940. The Chalker Patent, No. 2,224,375, issued December 10, 1940, also embodies the principle. The evidence conclusively shows that the lower, lateral, advanced jet, as well as the firing plate, have been known to the industry and art for many years prior to the construction of either the Yates or Berkley plates.

▊ The Court is of the opinion, therefore, that the Yates-plate does not represent an invention of a new device, and hence the patent is void.

▊ II. The Yates plate is a combination of known elements or devices, and the claims of its patent are based on invention occurring in such combination. If we concede invention to the combination arguendo,

still there is no infringement by the Berkley plate, because in it the combination is substantially different from that of Yates, and it does not embrace all or the same elements or parts as does the Yates plate.

The Yates plate does not have the second step, spanning the space between the two nozzles and lying above them, as described in the Berkley plate. In lieu thereof it has only the firing plate below the upper jets. The method of attaching the firing plate to the upper plate is entirely different in the two models, and this element is of importance in rendering the plate perdurable. Again, the plate of Berkley does not rest against the rear wall or firebox, as does the Yates plate, a factor affecting the draft in the firebox as well as the life of the plate. Furthermore, the Yates plate endeavors to guide the coal into the range of the lateral jets by means of low-pressure jets, included among the upper jets. The Berkley plan keeps the coal, intended to be controlled by the lateral jets, out of the range of the upper jets. In the Yates patent all the jets are connected with one and the same steam compartment, thus not giving the same control of the jets as is found in the Berkley.

▊ III. In substance, the plaintiff says that after conceiving the idea of his distributor plate, he sought in the early part of 1945, to interest the Seaboard in it; that the railroad officials referred him to Berkley, as the manufacturer of their distributor plates then in use; that he interviewed Samuel G. Jones, the president of Berkley, to whom he showed a rough drawing of his plate on May 1, 1945 or a few days later; that during the next week or two Berkley, while Yates was there, made up a plate incorporating Yates' ideas; that the new plate so made was successful in all of its tests at the Berkley plant; but that Berkley refused to let him have the pattern or model, refused to send it to Hamlet, North Carolina, for test by the Seaboard, and thereafter, beginning in July 1945, put the distributor plate on the market as its own and sold it to the Seaboard and other railroads.

The plaintiff put on the stand several locomotive engineers or firemen of the Sea-

board to prove that the plate, which has hereinbefore been described in detail as the new Berkley plate, was first placed on the Seaboard locomotives in the summer of 1945. This was not denied by the defendants. They did deny, however, that the original idea therefor sprang from Yates.

The Court is of the opinion from the evidence that the Berkley plate was not inspired by any disclosure made by or obtained from Yates.

When Yates went to the Berkley plant in May he did not submit any informative plan, diagram or drawing of his plate. The only document of this nature was what he terms to be a pencil or rough drawing. He admits that he submitted no model. The drawing was not put in evidence. The testimony of those who did see it was to the effect that it conveyed no impression from which a distributor plate could be made. Yates himself failed to describe it with definiteness or particularity. Too, he failed to call as a witness, although apparently available, the supposed draftsman of the rough or pencil drawing. More significantly, he did not at any time show to Berkley the detailed plans and specifications for his distributor plate, which necessarily must have then been in existence, because he had already filed the application for his patent thereon. Indeed the application was placed with the United States Patent Office within five days of Yates' first day at the Berkley plant.

On behalf of the defendants, it is shown by uncontroverted evidence that drawings of the new Berkley plate, made not as a design but from a pattern or model thereof, had been completed prior to Yates' call at the plant in May. A model of the new plate was seen at the Berkley plant in December, 1944, by the chief mechanical engineer of the Seaboard. The foundry records listed the use of material in November, 1944 for molding the new Berkley plate. Time cards of the plant reveal work on the plate long before the coming of Yates.

The patternmaker of Berkley testified that he produced the patterns for the new Berkley plate in the latter part of 1944, having obtained the idea from the B. & O. or Capps distributor plate.

Intimation that any of the defendants stole the idea for the Berkley plate from Yates finds no support in the evidence.

What has been said as to the prior ownership of the idea by Berkley is especially pertinent to the other contentions of the plaintiff. Aside from patent infringement, plaintiff insists that he should be granted relief in this action in two phases: (1) that the defendant be required specifically to return to the plaintiff the distributor plate made in May, 1945 by Berkley at the instance of Yates, and that the plaintiff recover damages of Berkley for its failure to do so previously, and (2) that under the common law doctrine of trusts, the plaintiff is entitled to require an accounting of Berkley, for that, Berkley and Jones obtained the idea and plan of the Yates' plate, while Jones was acting in a fiduciary relationship to Yates, and abused the trust by appropriating the plate to their use.

As to the return of the plate made by Berkley while Yates was there, that relief is not now possible, because the plate was destroyed soon after his visit there.

However, the evidence establishes that, except for compliance with the request of Yates that five steam compartments be installed on it, the plate tested on the occasion of his visit was the Berkley plate—that it was not a creature of Yates' ideas or plans. It is noteworthy that the Yates patent provides for only one steam compartment.

Berkley reconstructed and tested the plate for Yates as a courtesy to Yates, who was an employee of the Seaboard for whom Berkley did a great deal of work. It was not made on order or under any agreement between Yates and Berkley. Neither of them was contractually obligated to the other. True, Yates afterwards returned to the plant, offered to pay for the plate, and requested its delivery to him. This was refused. In this Berkley was clearly right. The plate as made on Yates' visit, embodied the Berkley plan almost entirely, and delivery of the plate to Yates was an appearance to be avoided, lest the

impression. follow that the plate was the idea of Yates.

Nor is there to be imputed a trust relation as between Jones and Yates. The evidence presents none. Besides, Yates revealed nothing, concrete or in concept, of which Jones could have become possessed or Yates dispossessed.

The complaint will be dismissed, with costs to the defendants. Counsel are requested to submit proposed findings, conclusions and decree within seven (7) days.